PEOPLE of the State of Colorado, ex rel. Ken SALAZAR, in his official capacity as Attorney General for the State of Colorado, Petitioner,

Mark Udall, individually as a citizen of Colorado, and in his capacity as the elected representative to the United States House of Representatives for the Second Congressional District of the State of Colorado, Petitioner-in-intervention,

v.

Donetta DAVIDSON, in her official capacity as Secretary of State for the State of Colorado, Respondent,

Colorado General Assembly, Respondent-in-intervention.

Donetta Davidson, in her official capacity as Secretary of State for the State of Colorado, Petitioner,

v.

Ken Salazar, in his official capacity as Attorney General for the State of Colorado, Respondent.

Nos. 03SA133, 03SA147.

Supreme Court of Colorado, En Banc.

Dec. 1, 2003.

1222

Friedlob, Sanderson, Paulson & Tourtillott, LLC, James W. Sanderson, Richard K. Kaufman, Denver, Colorado, Attorneys for Petitioner Donetta Davidson in Case No.

03SA147 and for Respondent Donetta Davidson in Case No. 03SA133.

Ken Salazar, Attorney General, Alan J. Gilbert, Solicitor General, Anthony Navarro, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent Ken Salazar in Case No. 03SA147.

Ken Salazar, Attorney General, Alan Gilbert, Solicitor General, Renny Fagan, Deputy Attorney General, M. Terry Fox, Assistant Attorney General, Anthony Navarro, Assistant Attorney General, Monica Marquez, Assistant Attorney General, Denver, Colorado, Attorneys for Petitioner Ken Salazar in Case No. 03SA133.

Christopher G. Seldin, Assistant Pitkin County Attorney, Aspen, Colorado, Attorney for Petitioner–in–Intervention Board of County Commissioners of the County of Pitkin.

Brownstein, Hyatt & Farber, P.C., Stanley L. Garnett, Lynne M. Hufnagel, P. Cole Finegan, Scott A. Sundstrom, Denver, CO, Attorneys for Petitioner–in–Intervention Mark Udall.

Hale Hackstaff Friesen, LLP, Allan L. Hale, Richard A. Westfall, Scott E. Gessler, Denver, Colorado, Attorneys for Respondent–in–Intervention Colorado General Assembly.

Britt I. Weygandt, Jonathan M. Anderson, Denver, Colorado, Attorneys for Governor Bill Owens.

Thurbert E. Baker, Jeff L. Milsteen, Atlanta, Georgia, Lawrence E. Long, Attorney General of South Dakota, Roxanne Giedd, Assistant Attorney General of South Dakota, Pierre, South Dakota, Attorneys for Amici Curiae Thurbert E. Baker, Attorney General of Georgia; Lawrence E. Long, Attorney General of South Dakota; and the Attorneys General of 42 other States and Territories.

Jenner & Block, LLC, Sam Hirsch, Washington, D.C., Pendleton, Friedberg, Wilson & Hennessey, P.C., Edgar L. Neel, Michelle M. Merz, Denver, Colorado, Attorneys for Amicus Curiae Congresswoman Diana DeGette, the elected member of the United States House of Representatives for the First Congressional District of the State of Colorado.

Burt Neuborne, Deborah Goldberg, J.J. Gass, New York, New York, O'Melveny & Myers, LLP, Ronald A. Klain, Charles E. Borden, Washington, D.C., Attorneys for Amicus Curiae Brennan Center for Justice.

Brenda L. Jackson, Fremont County Attorney, Canon City, Colorado, Attorney for Amicus Curiae Fremont County, through its Board of Commissioners, Norma J. Hatfield, in her official capacity as the Clerk and Recorder for Fremont County.

Schwarz McNab & Bailey, P.C., Christopher M. Kamper, Denver, Colorado, Attorneys for Amicus Curiae Colorado Common Cause.

Davis & Ceriani, P.C., Patrick J. Kanouff, Denver, Colorado, Attorneys for Amici Curiae Gail Schwartz and Cindy Carlisle.

Berenbaum, Weinshienk & Eason, P.C., Michael J. Belo, Timothy D. Knaus & Associates, Timothy D. Knaus, Foster, Graham & Huttner, LLP, Michael Huttner, Denver, Colorado, Attorneys for Amicus Curiae Christine Baca.

McDermott Law Firm, Daniel B. Slater, Canon City, Colorado, Attorneys for Amici Curiae Fremont County Democratic Party and Roberto Costales.

Ballard Spahr Andrews & Ingersoll, LLP, A. Thomas Downey, Denver, Colorado, Attorneys for Amicus Curiae Colorado House Minority in Support of Attorney General Salazar's Original Petition.

Kenneth L. Smith, Pro Se, Golden, Colorado.

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I. Introduction

The cases before us are matters of great public importance involving the fundamental rights of Colorado citizens to vote for their representatives in the United States Congress. In the closing days of the 2003 legislative session, the General Assembly enacted a bill to redraw the boundaries of Colorado's seven congressional districts. With this new law, the General Assembly intended to supplant the court-ordered 2002 redistricting plan, which governed the 2002 general elec-

tion. Pitted against each other in this dispute are two strongly opposed views of the Colorado Constitution.

The Secretary of State and the General Assembly interpret the state constitution as an unlimited grant of power from the People of Colorado to the General Assembly to draw and redraw congressional district boundaries. Under this view, the General Assembly may change the congressional districts as frequently as it likes, even if an earlier General Assembly or the courts have already redrawn congressional districts since the most recent census. At the same time, these parties contend that the Attorney General has no power to ask this court to exercise its original jurisdiction to review the constitutionality of the General Assembly's districts.

The Attorney General presents a very different understanding of Colorado law. He argues that although our constitution directs the General Assembly to draw congressional boundaries, it limits the timeframe and frequency within which the General Assembly may do so. Specifically, the General Assembly may redistrict only once every ten years, and this must occur immediately after each federal census. Accordingly, the General Assembly loses its power to redistrict if it does not act within the window of time beginning after each federal census when Congress apportions seats for the U.S. House of Representatives and ending with the next general election. The Attorney General also maintains that he may petition this court to exercise its original jurisdiction to decide state constitutional issues of public importance. Similarly, the Attorney General does not oppose the Secretary of State's ability to petition this court for relief in an appropriate case.

Because of the importance of the issues raised, we exercise our discretion to decide two cases. The first is the Attorney General's constitutional challenge to the General Assembly's congressional redistricting bill. The second is the Secretary of State's separate challenge to the Attorney General's authority to bring the first case. We decide both issues as a matter of state law.

Since our constitution was ratified in 1876, the congressional redistricting provision found in Article V, Section 44, has always provided, as it does today, that the General Assembly shall redistrict the congressional seats "[w]hen a new apportionment shall be made by Congress." There is no language empowering the General Assembly to redistrict more frequently or at any other time. To reach the result that the Secretary of State and the General Assembly would have us reach, we would have to read words into Section 44 and find that the General Assembly has implied power to redistrict more than once per census period.

We cannot do that, however, because another section of the original Colorado Constitution makes it clear that the framers carefully chose the congressional redistricting language and that this language gives no implied power to the General Assembly. Article V, Section 47, of the original 1876 Constitution addressed legislative redistricting, and originally stated that "[s]enatorial and representative districts may be altered from time to time, as public convenience may require." The phrase "from time to time" means that an act may be done occasionally. Had the framers wished to have congressional district boundaries redrawn more than once per census period, they would have included the "from time to time" language contained in the legislative redistricting provision. They did not.

In addition to the plain language of our constitution, Colorado has had 127 years of experience in applying the congressional redistricting provision. It has never been given the interpretation advanced by the Secretary of State and General Assembly.

Congressional redistricting, like legislative redistricting, has had a checkered history in Colorado, marked by long periods of time when the General Assembly failed to redistrict even though the state population grew dramatically and Colorado received more congressional seats. The federal government has conducted thirteen federal censuses since Colorado became a state, but the General Assembly has redrawn congressional districts only six times. The legislature's failure to redistrict meant that urban areas were systematically underrepresented, and

congressional districts were grossly disproportionate. For example, in 1964, when the General Assembly had not drawn new districts for over forty years, the four congressional districts ranged in population from 195,551 to 653,954; one person's vote in the smallest district was equivalent to the votes of 3.3 people in the largest district.

This era of inaction came to an abrupt end when the United States Supreme Court announced its "one-person, one-vote" principle and ordered Colorado to comply. *See generally Lucas v. Forty–Fourth Gen. Ass'y*, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964). In the cases leading up to *Lucas*, this court, as well as a federal district court in Colorado, held that the legislature's inaction violated both the Colorado and the U.S. Constitutions. *See generally In re Legislative Reapportionment*, 150 Colo. 380, 374 P.2d 66 (1962); *Lisco v. McNichols*, 208 F.Supp. 471 (D.Colo.1962). These and other better-known cases ushered in a new era in which there can be no doubt that the state must redistrict both its legislative and congressional seats after every new census. *See generally, e.g., Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Within ten years of the *Lucas* decision, the voters of Colorado passed an initiative putting the power to redistrict the legislature into the hands of a constitutionally created reapportionment commission. *See* Colo. Const. art. V, § 48. The constitutional provision governing congressional redistricting, however, was not substantially changed. Colorado's congressional seats have been redistricted four times since the *Lucas* decision: twice, following the 1970 and 1990 censuses, by the General Assembly; twice, in 1982 and 2002, by the courts after the legislature failed to act. After the 1980 census, the federal court did the congressional redistricting. *Carstens v. Lamm*, 543 F.Supp. 68 (D.Colo.1982). After the 2000 census, the task of congressional redistricting fell to the state court. *Beauprez v. Avalos*, 42 P.3d 642 (Colo.2002).

In this opinion, we conclude that the General Assembly does not have the unprecedented power it claims. Federal law grants the states the authority to redistrict, and federal law defines and limits this power. Our state constitution cannot change these federal requirements. Instead, it can only place additional restrictions on the redistricting process. Therefore, even though the first sentence of Article V, Section 44, of our constitution appears to grant redistricting power to the state "general assembly" acting alone, this language has been interpreted broadly to include the Governor's power to approve or disapprove the legislature's redistricting plan, and the voters' power to redistrict by initiative or by resort to the courts if the legislature fails to timely act. Finally, the second sentence of Article V, Section 44, of the Colorado Constitution says "when" Colorado may redistrict. The plain language of this constitutional provision not only requires redistricting after a federal census and before the ensuing general election, but also restricts the legislature from redistricting at any other time.

In short, the state constitution limits redistricting to once per census, and nothing in state or federal law negates this limitation. Having failed to redistrict when it should have, the General Assembly has lost its chance to redistrict until after the 2010 federal census.

## II. Background

In 2000, the United States census reflected Colorado's rapid growth of the 1990s and prompted Congress to assign Colorado one additional seat in the United States House of Representatives, bringing our total seats to seven. Because federal law requires each state to have the same number of congressional districts as it does representatives, the old redistricting plan, which contained only six districts, became illegal. *See* 2 U.S.C. § 2c (2000); *Beauprez*, 42 P.3d at 646. Consequently, when the federal government released detailed, block-by-block redistricting data in March 2001, the state General Assembly began the task of drawing new congressional districts.[1]

---

**1.** The terms "redistricting" and "reapportion- ment" are often used interchangeably. To re-

The General Assembly was unable to pass a new plan despite meeting in its regular session and two special sessions. Therefore, the voters turned to the courts for relief, asking the Denver District Court to hold the existing six-district plan unconstitutional and to replace it with a valid seven-district plan. *Avalos v. Davidson,* No. 01CV2897, 2002 WL 1895406, at *1 (Denv.Dist.Ct. Jan. 25, 2002), *aff'd sub nom. Beauprez v. Avalos,* 42 P.3d 642 (Colo.2002).

The district court considered more than a dozen competing maps during a seven-day trial, and ultimately settled upon a new seven-district plan. *See Beauprez,* 42 P.3d at 645–46. The court, however, delayed issuing its decision in order to give the legislature yet another chance to pass its own plan during the 2002 session. Finally, after the General Assembly again was unable to act, the court announced its redistricting plan in time for the precincts to be set before the November election.

This court unanimously affirmed the district court decision, saying that the plan was "thorough, inclusive, and non-partisan." *Id.* at 647, 653. The plan did indeed end up being non-partisan. From six districts, the voters reelected the incumbent or a replacement from the incumbent's party, and the new seventh district was highly competitive. In fact, in 2002, the seventh district voters elected their congressional representative by only 121 votes out of 170,000 voters—the narrowest margin in the nation.

In the closing days of the 2003 regular session, the newly elected General Assembly enacted a new redistricting plan, Senate Bill 03–352 ("SB 03–352"). *See* Ch. 247, sec. 1, § 2–1–101, 2003 Colo. Sess. Laws 1645, 1645–58. The bill was introduced on May 5, 2003, passed by both houses on May 7, the final day of the session, and was signed into law on May 9.

On the same day that the Governor signed SB 03–352 into law, a group of citizens filed suit in Denver District Court, asking the court to enjoin implementation of the plan.[2] *Keller v. Davidson,* No. 03CV3452 (Denv. Dist. Ct. filed May 9, 2003). That case has since been removed to federal court, and is now on hold by order of the federal district court pending this decision. *Keller v. Davidson,* No. 03–Z–1482(CBS) (D. Colo. filed Sept. 25, 2003).

On May 14, shortly after the District Court case was filed, the Attorney General filed an original action in this court pursuant to the Colorado Constitution, Article VI, Section 3, asking us to issue an injunction preventing the Secretary of State from implementing the General Assembly's 2003 redistricting plan and requesting a writ of mandamus requiring the Secretary of State to return to the 2002 redistricting plan. Subsequently, the Secretary of State filed her own original action with this court, asking us to dismiss the Attorney General's petition. She claims that the Attorney General cannot bring an original proceeding in this type of case and cannot name the Secretary of State as a respondent because he is ethically obligated to represent her. We issued a rule to show cause in both cases. We now make the rule absolute in the case brought by the Attorney General and we discharge the rule in the Secretary of State's case.

### III. Jurisdiction

Both the Attorney General's case and Secretary of State's case are original proceedings pursuant to Article VI, Section 3, of the Colorado Constitution. Article VI, Section 3, states in relevant part: "The supreme court shall have power to issue writs of . . . mandamus, . . . injunction, and such other . . . writs as may be provided by rule of court. . . ." Colo. Const. art. VI, § 3. Original proceedings are controlled by Colorado

---

duce confusion, we avoid the term "reapportionment," and use "redistricting" to refer to the process of drawing the districts from which representatives will be elected. *Black's Law Dictionary* 1283 (7th ed.1999). We use the term "apportionment" to mean "allocation of congressional representatives among the states based on population. . . ." *Id.* at 97.

**2.** Plaintiffs in that case allege that the General Assembly violated a variety of state laws regarding the procedure by which the lawmakers must introduce, read, debate and pass bills. Those issues were not raised in this case, and so we do not consider them in today's decision.

Appellate Rule 21(a)(1), which states that: "Relief under this rule is extraordinary in nature and is a matter wholly within the discretion of the Supreme Court. Such relief shall be granted only when no other adequate remedy ... is available." C.A.R. 21(a)(1). Although we have discretion regarding the cases we choose to hear, we have established two basic requirements for original proceedings such as these.[3] First, the case must involve an extraordinary matter of public importance. *Leaffer v. Zarlengo*, 44 P.3d 1072, 1077 (Colo.2002). Second, there must be no adequate "conventional appellate remedies." *Id.; see also* William H. ReMine, Anne Whalen Gill & Gregory J. Hobbs, Jr., *Appeals to the Supreme Court, Supreme Court Original Proceedings* § 15.3, *in* Leonard P. Plank & Anne Whalen Gill, *Colorado Appellate Law and Practice* 217 (1999). Both of the cases we decide today satisfy both requirements. We examine the Attorney General's case first.

■ There can be no question that the Attorney General's case involves an extraordinary matter of public importance. Congressional redistricting implicates citizens' right to vote for United States Representatives. This right to vote is fundamental to our democracy. According to the United States Supreme Court, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

The frequency of redistricting affects the stability of Colorado's congressional districts, and hence, the effectiveness of our state's representation in the United States Congress. When the boundaries of a district are stable, the district's representative or any hopeful contenders can build relationships with the constituents in that district. Furthermore, the constituents within a district can form communities of interest with one another, and these groups can lobby the rep-

resentative regarding their interests. These relationships improve representation and ultimately, the effectiveness of the district's voice in Congress.

Furthermore, the specific outcome of the Attorney General's case resolves the debate over the shapes of the congressional districts for the 2004 elections. Until this dispute is settled, Colorado citizens and their representatives in Congress will not know whether the 2004 elections will take place under the same districts as the 2002 elections or according to SB 03–352's new districts. The uncertainty surrounding the 2004 congressional districts has forced some voters, local officials, and interest groups to act as if they could be in either one of two districts, and, thus, to expend unnecessary money and effort building relationships with both of their potential representatives and districts. Moreover, this uncertainty carries over to other elected and appointed officials, such as the University of Colorado Board of Regents, whose districts follow the congressional map. In sum, congressional redistricting is a crucial issue, which warrants a decisive and expedient resolution from this court.

The second factor in considering whether to exercise our original jurisdiction is whether the parties have an adequate alternative remedy. The remedy may be an action in a trial court or an appeal in an ongoing proceeding. C.A.R. 21(a)(1). As noted above, there is now a case in the federal district court that also challenges SB 03–352. *Keller,* No. 03–Z–1482(CBS). The Secretary of State urges that this federal case is an adequate remedy to the Attorney General's claims. We disagree.

The federal case is not an adequate form of relief for several reasons. An appellate court will often defer to a trial court when a case can be resolved on a ground that makes it possible to avoid reaching a constitutional issue. Here, however, the constitutional question cannot be avoided. In *Keller,* the plaintiffs did not raise the question of whether Article V, Section 44, of the Colorado Constitution restricts congressional redis-

---

**3.** The criteria are different if the case is the equivalent of an interlocutory appeal, or the result of an alleged abuse of discretion in a lower court proceeding that cannot be cured on appeal. *See People v. Braunthal,* 31 P.3d 167, 172 (Colo. 2001).

tricting to once per decade. If the trial court were to hold that SB 03–352 is invalid because of a procedural error in its enactment, as alleged, the question would remain whether the General Assembly could redistrict more than once in a census period.

Also, the federal court is not the appropriate forum to decide the frequency of redistricting. The United States Supreme Court has made it clear that states have primary responsibility in congressional redistricting and that federal courts must defer to states. *Growe v. Emison,* 507 U.S. 25, 34, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (saying "reapportionment is primarily the duty and responsibility of the State"); *see also Branch v. Smith,* 538 U.S. 254, 123 S.Ct. 1429, 1435, 155 L.Ed.2d 407 (2003).

Most importantly, this case turns on the Colorado Constitution. The United States Supreme Court "repeatedly has held that state courts are the ultimate expositors of state law." *Mullaney v. Wilbur,* 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Consequently, even if the *Keller* court were to address the issue of how frequently the General Assembly may draw congressional districts, the federal court would have to turn to this court to answer that question. *See S.C. State Conference of Branches of NAACP v. Riley,* 533 F.Supp. 1178, 1180 (D.S.C.1982) (redistricting case in which a federal district court said that only the South Carolina Supreme Court could interpret the state constitution's redistricting provision). Hence, it is illogical for this court to defer to the federal court. In sum, the Attorney General's petition presents an issue uniquely suited for resolution in an original proceeding.

■ In the second case that we decide today, the Secretary of State raises an issue that is also appropriately resolved in an original proceeding. The Secretary is the named respondent in the Attorney General's petition, and she challenges the Attorney General's authority to file such an original proceeding. The Attorney General's authority to sue the Secretary of State is a matter of public importance. Both are constitutional officers of the executive branch, and this is the proper vehicle to resolve their dispute. Thus, we exercise our discretion to decide both original proceedings.

## IV. The Attorney General's Authority to Sue the Secretary of State

■ Before turning to the question of whether the General Assembly had the authority to redistrict in 2003, we first address the question of whether the Attorney General has the authority to petition this court to enjoin the Secretary of State from conducting the elections under SB 03–352. The Secretary of State contends that the Attorney General has no constitutional, statutory, or common law power to petition this court for the relief requested and that, by filing the petition, the Attorney General violates his ethical duty to represent the Secretary. We reject both arguments. We see no reason to depart from our long-established practice allowing the Attorney General to petition this court in an appropriate case.

■ We have always recognized the ability of the Attorney General and other public officials to request original jurisdiction in matters of great public importance. The case closest to the one before us today is *People v. Tool,* 35 Colo. 225, 86 P. 224 (1905). In *Tool,* we explicitly recognized the common law power of the Attorney General to bring an original proceeding in order to protect the integrity of the election process. The Attorney General was the appropriate person to institute such an action, because "it is the function of the Attorney General ... to protect the rights of the public...." *Id.* at 236, 86 P. at 227; *see also People ex rel. Graves v. Dist. Court,* 37 Colo. 443, 461, 86 P. 87, 92 (1906).[4]

---

4. The Attorney General's authority to bring an original proceeding in matters involving the public good is also consistent with Colorado's broad conception of taxpayer standing, which is grounded in this court's recognition of taxpayers' interest in living under a constitutional government. *See Howard v. City of Boulder,* 132 Colo. 401, 404, 290 P.2d 237, 238 (1955); *Colo. State Civil Servs. Employees Assoc. v. Love,* 167 Colo. 436, 444, 448 P.2d 624, 627 (1968). Under this court's jurisprudence, ordinary taxpayers would have standing to challenge the constitutionality of the 2003 redistricting statute in an original proceeding. The Attorney General, as an ordi-

In an even earlier case, *Wheeler v. Northern Colorado Irrigation Co.*, we similarly held that it was "eminently fitting" that original proceedings be initiated by the Attorney General in the name of the people. 9 Colo. 248, 256, 11 P. 103, 107 (1886). Likewise, in *State Railroad Commission v. People ex rel. Denver & R.G.R. Co.*, we affirmed the Attorney General's authority to bring an original writ, underscoring the principle that "the Attorney General himself, as the chief legal officer of the state, is here in the interests of the people to promote the public welfare...." 44 Colo. 345, 354, 98 P. 7, 11 (1908).

Despite this precedent, the Secretary of State argues that the Attorney General is limited to his express statutory powers. We reject this argument. The Colorado Constitution vests original jurisdiction in the Supreme Court. Colo. Const. art. VI, § 3. The constitutional separation of powers prevents the General Assembly from enacting any statutes that restrict this court's exercise of its original jurisdiction. Hence, it is irrelevant that no statute authorizes the Attorney General to file his petition.

The Secretary of State also reads our decision in *People ex rel. Tooley v. District Court* to stand for the principle that the Attorney General has no common law powers. 190 Colo. 486, 549 P.2d 774 (1976). We reject such a sweeping interpretation. *Tooley* is consistent with the well-settled principle that the Attorney General has common law powers unless they are specifically repealed by statute. *Colo. State Bd. of Pharmacy v. Hallett*, 88 Colo. 331, 335, 296 P. 540, 542

(1931); *see also Kane v. Town of Estes Park*, 786 P.2d 412, 415 (Colo.1990). In *Tooley*, the legislature expressly abrogated the Attorney General's common law power to institute criminal actions in a trial court in favor of other constitutional officers, the district attorneys. *Id.*

■ The Secretary of State misses the true significance of *Tooley*, which in fact supports the Attorney General's ability to file an original proceeding in this court. In *Tooley*, the district court ruled that the Attorney General and not the District Attorney could prosecute certain criminal actions. The Denver District Attorney subsequently sought this court's review of that ruling by filing an original proceeding. 190 Colo. at 488, 549 P.2d at 776. Although we decided that the Attorney General did not have that power, the outcome is not relevant. What is important here is that we accepted jurisdiction and heard the District Attorney's case. Had the district court ruled the other way, we would have heard the Attorney General's petition instead because this was a matter of public importance—a conflict between two officers of the state.[5] Therefore, *Tooley* actually supports the Attorney General's position in this case.

The Secretary of State also asserts that the Attorney General has violated the Colorado Rules of Professional Conduct by naming her as the respondent. We find no ethical violation. The Secretary of State is named as a party in her official capacity because she administers the election laws.

nary taxpayer, could raise this case; therefore, he should also be able to petition this court in his capacity as chief legal officer of the state of Colorado.

5. The Secretary of State also makes an historical argument to support her position, placing great emphasis upon the fact that Colorado adopted the English common law of 1607 into its body of laws. § 2–4–211, 1 C.R.S. (2002); *Bieber v. People*, 856 P.2d 811, 815 (Colo.1993). In 1607, England's Attorney General was subject to the wishes of the crown, and could not independently institute actions against it. 6 W. Holdsworth, *History of English Law*, 457–61 (2d ed.1971). The Secretary of State posits that the Attorney General is similarly subject to the wishes of the executive branch. This argument does not per-

suade us. Although Colorado has incorporated the common law of 1607, we find its transposition to Colorado, where executive power is intentionally diffused among several officers, is necessarily approximate. The Attorney General acts as the chief legal representative, not of a king, but of the state. Therefore, the common law applies only to the extent that it is consistent with the Colorado Constitution. As section 2–4–211 states, Colorado adopts the common law of 1607 insofar as it is "applicable and of a general nature." *See also Lovato v. Dist. Court*, 198 Colo. 419, 425, 601 P.2d 1072, 1075 (1979); *Vogts v. Guerrette*, 142 Colo. 527, 533, 351 P.2d 851, 855 (1960); *Crippen v. White*, 28 Colo. 298, 302, 64 P. 184, 185 (1901).

§ 1–1–107(1)(a), 1 C.R.S. (2003). In this case, no client confidences are involved.

The Colorado Rules of Professional Conduct explicitly recognize that government lawyers may "have authority to represent the 'public interest' in circumstances where a private lawyer would not be authorized to do so." Colo. R.P.C., Scope. The Rules say that a government lawyer's client may in some circumstances be a specific agency, but "it is generally the government as a whole." Colo. R.P.C. 1.13 cmt. Therefore, the Attorney General must consider the broader institutional concerns of the state even though these concerns are not shared by an individual agency or officer.[6]

In his role as legal advisor to the Secretary of State, the Attorney General must advise the Secretary of State on the implementation of the election laws. Consistent with his ethical duties and his oath of office, if the Attorney General has grave doubts about the constitutionality of the impending 2004 general election, he must seek to resolve these doubts as soon as possible. A prompt resolution of the case will aid both the Secretary of State and the Attorney General in fulfilling their oaths to uphold the Colorado Constitution. For these reasons, we find that the Attorney General has the authority to file this original action challenging the constitutionality of SB 03–352.

## V. The General Assembly's Power to Redistrict

We now turn to the question of whether SB 03–352 violates the Colorado Constitution. We hold that it does. We base our holding on Article V, Section 44, of the Colorado Constitution, which prohibits congressional redistricting more than once per decade. More specifically, Article V, Section 44:(1) requires congressional redistricting after a national census and before the ensuing general election; and (2) prohibits redistricting outside of this window. We recognize and emphasize that the General Assembly has primary responsibility for drawing congressional districts. But we also hold that

when the General Assembly fails to provide a constitutional redistricting plan in the face of an upcoming election and courts are forced to step in, these judicially-created districts are just as binding and permanent as districts created by the General Assembly. We further hold that regardless of the method by which the districts are created, the state constitution prohibits redrawing the districts until after the next decennial census.

We base our decision on the Colorado Constitution, but to put state law in context, we begin with a discussion of federal law. First, the U.S. Constitution does not grant redistricting power to the state legislatures exclusively, but instead, to the states generally. The state may draw congressional districts via any process that it deems appropriate. Second, the states' redistricting authority is not "unfettered." Rather, it is circumscribed by federal law. Each state must draw congressional districts immediately after each federal census and before the ensuing general election. There must be one district per representative, and the resulting districts in any given state must be equal in size and comply with the Voting Rights Act.

Third, like the U.S. Constitution, the Colorado Constitution does not grant the General Assembly exclusive authority to draw congressional districts. Redistricting can be accomplished by enacting a bill subject to gubernatorial approval, by voter initiative, and through litigation.

Finally, the Colorado Constitution cannot relax the federal laws pertaining to redistricting; our constitution can only impose more stringent restrictions. Article V, Section 44, of the Colorado Constitution does just that. It restricts the timeframe in which Colorado may redistrict. The plain language of this constitutional provision not only requires redistricting after a federal census and before the ensuing general election, but also prohibits the legislature from redistricting at any other time.

In conclusion, the state constitution limits redistricting to once per census, no matter

---

**6.** Other states have considered the Attorney General's ethical obligations in inter-executive disputes, and their decisions accord with ours to-

day. *See Perdue v. Baker,* 277 Ga. 1, 586 S.E.2d 606 (2003); *State ex rel. Condon v. Hodges,* 349 S.C. 232, 562 S.E.2d 623 (2002).

which body creates the districts. Nothing in state or federal law contradicts this limitation. In fact this interpretation is supported by public policy, history, and the law of other states. The following subsections discuss these concepts in greater detail.

### A. The U.S. Constitution's Grant of Power to the States

■ The Secretary of State and General Assembly argue that both the United States and Colorado Constitutions grant the General Assembly the exclusive authority to draw congressional districts. In support of this argument, they point to Article I, Section 4, Clause 1, of the U.S. Constitution, which says: "The times, places and manner of holding elections for senators and representatives shall be prescribed in each state, by the *legislature* thereof...." U.S. Const. art. I, § 4, cl. 1 (emphasis added). The Secretary of State and General Assembly assert that the word "legislature" in this clause means that the General Assembly is the only body with authority to draw permanent congressional districts, and that the court may not "usurp" this absolute power.

■ This argument is flawed. The United States Supreme Court has interpreted the word "legislature" in Article I to broadly encompass any means permitted by state law, and not to refer exclusively to the state legislature. A state's lawmaking process may include citizen referenda and initiatives, mandatory gubernatorial approval, and any other procedures defined by the state. *See Smiley v. Holm,* 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932) (gubernatorial approval); *Ohio ex rel. Davis v. Hildebrant,* 241 U.S. 565, 36 S.Ct. 708, 60 L.Ed. 1172 (1916) (referenda).

The word "legislature" also extends to special redistricting commissions. Arizona, for instance, has a special commission that draws congressional districts and then submits the plan directly to the Secretary of State, thus bypassing the Arizona legislature entirely. *See* Ariz. Const. art. IV, part 2, § 1; Rhonda L. Barnes, *Redistricting in Arizona Under the Proposition 106 Provisions: Retrogression, Representation, and Regret,* 35 Ariz. St. L.J. 575, 578–81 (2003). Other states with

redistricting commissions include Hawaii, Idaho, Montana, New Jersey, and Washington. Tim Storey, *Redistricting Spats Unlikely to Spread,* Denver Post, Sept. 28, 2003, at 1E, 8E.

■ Most importantly for our purposes, the word "legislature," as used in Article I of the federal Constitution, encompasses court orders. State courts have the authority to evaluate the constitutionality of redistricting laws and to enact their own redistricting plans when a state legislature fails to replace unconstitutional districts with valid ones. *See generally Growe,* 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388; *Carstens v. Lamm,* 543 F.Supp. 68 (D.Colo.1982). In fact, courts are constitutionally required to draw constitutional congressional districts when the legislature fails to do so. *Branch v. Smith,* 538 U.S. 254, 123 S.Ct. 1429, 1441, 155 L.Ed.2d 407 (2003). In such a case, a court cannot be characterized as "usurping" the legislature's authority; rather, the court order fulfills the state's obligation to provide constitutional districts for congressional elections in the absence of legislative action.

■ As these examples reveal, Article I, Section 4, Clause 1, of the U.S. Constitution delegates congressional redistricting power to the states to carry out as they see fit, and not exclusively to the state legislatures. Hence, the U.S. Constitution does not grant absolute redistricting authority to the General Assembly as the Secretary of State and the General Assembly claim, and when courts are forced to draw congressional districts, they are not usurping the state legislature's power.

### B. The U.S. Constitution's Restrictions on the General Assembly's Authority to Redistrict

Next, the Secretary of State and General Assembly argue that the U.S. Constitution grants the General Assembly absolute, "unfettered" redistricting authority that the states cannot curtail. This is not so. Instead, this authority is limited by both federal and state law. Before turning to state law, we first describe the federal case law and statutes that control redistricting to il-

lustrate that the General Assembly's redistricting authority is not "unfettered" as it claims.

Although the U.S. Constitution grants the power to draw congressional districts to the states, the states have often abused their broad redistricting authority. Historically, some state legislatures have used redistricting to enhance the power of the majority (racial and/or political), and to suppress minorities. *See generally* Andrew Hacker, *Congressional Districting: The Issue of Equal Representation* 30–70 (1963) [hereinafter Hacker, *Congressional Districting*]. The legislatures primarily disenfranchised voters either by gerrymandering or by neglecting redistricting duties altogether, thus allowing the sizes of the districts to become more and more unbalanced as populations shifted over time. The resulting size disparities were unfair because the representatives from larger population districts represented more citizens than representatives from smaller districts.

This disparity among districts meant that the citizens in the smaller population districts had a relatively more powerful voice in Congress. As an example, in 1962, Colorado's largest congressional district had 3.3 times the population of the smallest district. Thus, one vote in the smallest district was the same as 3.3 votes in the largest district. Hacker, *Congressional Districting* at 3. Even though the population of Colorado was shifting from rural to urban and suburban areas, the rural counties still elected more than their proportional share of representatives. *Lisco v. McNichols*, 208 F.Supp. 471, 478 (D.Colo. 1962); *see also* Hacker, *Congressional Districting* at 22–26. Yet the Colorado legislature neglected its duty to draw new congressional districts for more than forty years between 1921 and 1964. *Id.* at 3.

■ Because of this growing inequality among districts, the Supreme Court and Congress stepped in to protect the voters' rights. In 1964, the United States Supreme Court established the one-person, one-vote doctrine, requiring that every state make a good-faith effort to elect all representatives from districts of equal populations. *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (interpreting U.S. Const. art. I, § 2, cl. 1). Under this doctrine, states now have a constitutional obligation to draw congressional districts with equal numbers of constituents, or else justify any differences, no matter how small, with a legitimate reason. *Karcher v. Daggett*, 462 U.S. 725, 734, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).

■ When evaluating constitutionality under the one-person, one-vote doctrine, a court uses the national decennial census figures. The United States Supreme Court has recognized the legal fiction that these figures remain accurate for the entire ten years between censuses. *Georgia v. Ashcroft,* ── U.S. ──, ── n. 2, 123 S.Ct. 2498, 2516 n. 2, 156 L.Ed.2d 428 (2003). Consequently, according to this legal fiction, when states create same-size districts that adhere to one-person, one-vote standards at the beginning of the decade, these districts remain constitutionally valid on equal population grounds until the next census, even though the states' populations actually shift and change in the intervening years. *Id.* Conversely, new decennial census figures generally render the old districts unconstitutional, and states must redistrict prior to a subsequent election. *Id.* In sum, under federal constitutional law, each state must draw new congressional districts after a decennial census or risk having its districts declared unconstitutional prior to the next congressional election.

### C. Federal Statutory Restrictions on the General Assembly's Authority to Redistrict

Federal statutes also restrict how the states may redistrict. The states' authority to regulate the "times, places and manner" of congressional elections is not absolute. Instead, the United States Constitution gives Congress the power to "make or alter" election regulations "at any time." U.S. Const. art. I, § 4, cl. 1 ("The times, places and manner of holding elections for senators and representatives shall be prescribed in each State, by the legislature thereof, but the Congress may at any time, by law, make or alter such regulations....").

The "times, places and manner" clause was a very controversial provision in the U.S. Constitution. During the debates preceding ratification, the public expressed fear that Congress would usurp the states' powers to conduct elections. *See* I *The Debate on the Constitution: Federalist and Antifederalist Speeches, Articles, and Letters During the Struggle over Ratification* 429 (Bernard Bailyn ed., 1993). But the framers strongly believed that Congress must be empowered to step in and regulate elections if necessary to ensure that they are conducted fairly. *Wesberry v. Sanders,* 376 U.S. 1, 6, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); Hacker, *Congressional Districting* at 9, 12–14.

Even so, the Constitution was silent regarding whether states were required to draw single-member districts, or whether they were allowed to elect their representatives in at-large, statewide elections.[7] Hacker, *Congressional Districting* at 40. After the states ratified the United States Constitution, many elected all of their members of Congress at large. *Id.* But in 1842, Congress exercised its authority to regulate elections and passed the Apportionment Act, which prohibited the "winner-take-all," at-large elections, and required that states elect members of Congress from contiguous, single-member districts. *Id.* Congress allowed this requirement to lapse, however, and by 1962, many representatives were once again elected at large. *Id.* at 41.

Shortly after the United States Supreme Court announced the one-person, one-vote doctrine in 1964, many lower courts began to implement that decision by replacing unconstitutional, disproportionate districts with at-large elections. *Branch v. Smith,* 538 U.S. 254, 123 S.Ct. 1429, 1439, 155 L.Ed.2d 407

(2003). These courts did so because they found they had no authority to draw new districts. *Id.* at 1439–40, 123 S.Ct. 1429. Congress disagreed, and in 1967 enacted 2 U.S.C. § 2c, which once again required single-member congressional districts. *Id.* at 1441, 123 S.Ct. 1429. With this statute, Congress eliminated the option of at-large elections for states with more than one representative.[8] 2 U.S.C. § 2c (2002). Thus, states must draw same-size, single-member districts.

Another limitation on the General Assembly's freedom to redistrict is the Voting Rights Act. *See* 42 U.S.C. §§ 1973 to 1973bb–1 (2002); *Carstens v. Lamm,* 543 F.Supp. 68, 82 n. 36a (D.Colo.1982). Even while complying with Section 2c and the one-person, one-vote doctrine by drawing same-size, single-member districts, some state legislatures were able to discriminate against racial minorities by drawing their districts in such a way as to render minority votes ineffective. In an attempt to combat discrimination against minority voters, Congress passed the Voting Rights Act. Specifically, the Act forbids diluting the voting strength of a minority group "sufficiently large and geographically compact to constitute a majority in a single-member district." *Sanchez v. State,* 97 F.3d 1303, 1310 (10th Cir.1996) (citing *Thornburg v. Gingles,* 478 U.S. 30, 50, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)).

Section 5 of the Act requires jurisdictions with a history of discrimination to obtain federal approval before making any changes to voting laws or procedures. 42 U.S.C. § 1973c (2002). The process of obtaining approval is known as "preclearance." *See Branch,* 123 S.Ct. at 1446–47. In Colorado,

---

**7.** The at-large scheme does not violate the one-person, one-vote doctrine because all representatives are elected from the state as a whole, and hence, represent equal numbers of voters. *Wesberry,* 376 U.S. at 8, 84 S.Ct. 526.

**8.** Section 2c exempted states that had always elected all of their representatives at large. These states could continue the at-large elections. Section 2c states in full:

In each State entitled in the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to the provi-

sions of section 2a(a) of this title, there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative (except that a State which is entitled to more than one Representative and which has in all previous elections elected its Representatives at Large may elect its Representatives at Large to the Ninety-first Congress).

2 U.S.C. § 2c (2002).

El Paso County was once a covered jurisdiction, requiring preclearance. Thus, prior to implementing any voting change in El Paso County, including redistricting, the General Assembly was first required to obtain approval from either the United States Attorney General or a three-judge panel from the United States District Court for the District of Columbia. *Carstens,* 543 F.Supp. at 82 n. 36a.

■■■■ As these examples demonstrate, the General Assembly has never had "unfettered" authority to create congressional districts. Under federal law, Colorado must redistrict after each federal census and before the ensuing election, must create single-member districts, must create racially neutral districts, and at certain times in the past, was required to obtain federal preclearance for its plan. Moreover, because the United States Constitution grants redistricting authority to the states, and not exclusively to the legislatures of the states, Colorado has the authority to further limit the power of its General Assembly through its laws or constitution. As we illustrate below, Colorado has done just that.

### D. Colorado's Constitutional Restrictions on the General Assembly's Authority to Redistrict

The Secretary of State and General Assembly argue that the Colorado Constitution grants the General Assembly unfettered power to redistrict. We are not persuaded. As discussed above, the federal Constitution, not the state constitution, is the source of the states' authority to redistrict, and the federal Constitution and federal statutes restrict the states' authority to redistrict.

■■■ The Colorado Constitution can only further restrict the General Assembly's authority to draw congressional districts; it

cannot expand it. We know this is true because the Colorado Constitution is not a grant of power, but an additional limitation upon all forms of state power, including the authority of the General Assembly. *Reale v. Bd. of Real Estate Appraisers,* 880 P.2d 1205, 1208 (Colo.1994) ("The Colorado Constitution, unlike the federal Constitution, does not comprise a grant of but rather, a limitation on power."). Indeed, when our state constitution was ratified in 1876, there was a deep public distrust of the legislature due to Colorado's territorial history of scandal and corruption. Dale A. Oesterle & Richard B. Collins, *The Colorado State Constitution: A Reference Guide* 1–2, 20 n. 7 (2002). As a result, the delegates created a very detailed document specifically for the purpose of severely restricting the legislature's discretionary powers. *Id.* Given that the state constitution adds to the federal limitations on congressional redistricting, the crucial question is: "Exactly how does Article V, Section 44, limit Colorado's authority to redistrict?" We now turn to this question.

Article V, Section 44, has always been in the Colorado Constitution. It originally said, in full:

> One Representative in the Congress of the United States shall be elected from the State at large at the first election under this constitution, and thereafter at such times and places and in such manner as may be prescribed by law. When a new apportionment shall be made by Congress, the general assembly shall divide the State into congressional districts accordingly.

Colo. Const. art. V, § 44. This original language meant that the state's single representative was to be elected from a state-wide district, but as the United States Congress assigned Colorado additional seats, the General Assembly was required to draw additional congressional districts.[9]

9. In fact, as Colorado grew, the legislature did redistrict six times: 1891, 1913, 1921, 1964 (after the one-person, one-vote Supreme Court decision), 1972, and 1992. 1891 Colo. Sess. Laws 89 § 1; 1913 Colo. Sess. Laws 517 § 1; 1921 Colo. Sess. Laws 170 § 1; 1964 Colo. Sess. Laws 11 § 1 (First Extraordinary Session); 1972 Colo. Sess. Laws 184 § 1; 1974 Colo. Sess. Laws 40 § 19; 1992 Colo. Sess. Laws 593 § 2. In 1900,

Congress gave Colorado a third seat, and in 1910 a fourth, but the legislature did not redistrict between 1891 and 1913. Thus, the third and fourth members of Congress were elected at large from 1902 to 1912. Kenneth C. Martis, *The Historical Atlas of United States Congressional Districts: 1789–1983* (1982). The General Assembly did not redistrict in the more than forty years between 1921 and 1964 either. After the

In 1974, the General Assembly recommended and the people approved a change to Section 44. It now states, in full:

> The General Assembly shall divide the state into as many congressional districts as there are representatives in congress apportioned to this state by the congress of the United States for the election of one representative to congress from each district. When a new apportionment shall be made by congress, the general assembly shall divide the state into congressional districts accordingly.

Colo. Const. art. V, § 44. The first sentence states *who* must redistrict—the "General Assembly"—and *what* the General Assembly must do—create single-member congressional districts. The second sentence of Section 44 establishes *when* this redistricting shall take place—after a new congressional apportionment. Because the Attorney General's case turns upon the interpretation of Section 44, we will examine each of Section 44's sentences in turn.

### 1. Who May Redistrict

The Secretary of State and the General Assembly argue that three words in the state constitution grant the General Assembly exclusive power to draw Colorado's congressional districts: "General Assembly shall." At first blush, this logic seems persuasive; however, this argument is not consistent with existing Colorado law. Although the first sentence of Section 44 says that the "General Assembly shall" draw congressional districts, the term "General Assembly," like the term "legislature" in Article I of the U.S. Constitution, has been interpreted broadly. The term "General Assembly" encompasses the entire legislative process, as well as voter initiatives and redistricting by court order.

The term General Assembly does not simply refer to the lawmakers who must pass a bill. Instead, it is a shorthand method of referring to the entire standard lawmaking procedure set forth in the Colorado Constitution. *Carstens*, 543 F.Supp. at 79 ("Congres-

sional redistricting is a law-making function subject to the state's constitutional procedures."). These procedures require a majority quorum, approval by a committee, and reading of the bill at length on two different days in each house. *See, e.g.*, Colo. Const. art. V, §§ 11, 20 & 22. The standard lawmaking procedure includes passage by both houses of the legislature as well as the governor's signature or approval by inaction. *Carstens*, 543 F.Supp. at 79. With a two-thirds vote, the General Assembly may pass a redistricting bill over the governor's veto. Colo. Const. art. V, § 39.

Standard lawmaking procedure in Colorado also includes voter initiative. In 1934, this court upheld a legislative redistricting plan that was created by voter initiative and also rejected a subsequent plan adopted by the General Assembly. *Armstrong v. Mitten*, 95 Colo. 425, 430, 37 P.2d 757, 759 (1934). *Armstrong* involved state legislative redistricting, which now is performed by a special commission. At that time, however, the relevant section of the state constitution called for the General Assembly to "revise and adjust the apportionment for senators and representatives" during the "session next following" a census. *Id.* at 426–27, 37 P.2d at 758. The legislature failed to enact a redistricting plan in the session following the 1930 census. As a result, the voters initiated and passed a plan in 1932. Then, in 1933, the General Assembly enacted its own plan. In *Armstrong*, we held that the initiated plan was valid and enforceable. In so holding, we reasoned that "[t]he people are sovereign" and they created the General Assembly as "their agent." *Id.* Consequently, we rejected a literal interpretation of the term "General Assembly," and instead held that "General Assembly" broadly encompassed all legislative processes, including voter initiative. *Armstrong's* holding applies to congressional redistricting as well.

The term "General Assembly" in Section 44 also encompasses the courts, but only in the special instance when the General Assembly fails to provide constitutional districts

federal censuses in 1980 and 2000, the General Assembly was unable to pass a redistricting bill, and the courts were forced to redistrict instead. *See Carstens*, 543 F.Supp. at 71–72; *Beauprez v.*

*Avalos*, 42 P.3d 642, 645–46 (Colo.2002). Thus, since Colorado became a state, there have been thirteen federal censuses, and the General Assembly has redistricted only six times.

for an impending election. In an early case, *In re Legislative Reapportionment,* this court said:

> [I]t is manifest that the triunity of our government is not invaded by acceptance of this litigation for decision. If by reason of passage of time and changing conditions the reapportionment statute no longer serves its original purpose of securing to the voter the full constitutional value of his franchise, and the legislative branch fails to take appropriate restorative action, the doors of the courts must be open to him.

150 Colo. 380, 384–85, 374 P.2d 66, 68–69 (1962) (quoting *Village of Ridgefield Park v. Bergen County Bd. of Taxation,* 31 N.J. 420, 157 A.2d 829, 832 (1960)). Prior to the 1960s, the United States Supreme Court refused to interfere with redistricting issues. *See, e.g., Colegrove v. Green,* 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946). Instead, the Court deemed redistricting a political issue that was nonjusticiable. *Id.* In 1962, in *Baker v. Carr,* the United States Supreme Court reversed *Colegrove* and held that redistricting was a justiciable issue. 369 U.S. 186, 208–09, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Accordingly, in *In re Legislative Reapportionment,* the Colorado Supreme Court said that it would draw districts, but only if the legislature failed to act. 150 Colo. at 385, 374 P.2d at 69.

In the forty years since *Baker v. Carr,* court involvement in redistricting has become more common. Although courts continue to defer to the legislatures, the courts must sometimes act in order to enforce the one-person, one-vote doctrine. Indeed, Congress enacted 2 U.S.C. § 2c specifically for the purpose of forcing courts to draw valid redistricting plans rather than resorting to at-large districts. *Branch v. Smith,* 538 U.S. 254, 123 S.Ct. 1429, 1439, 1445, 155 L.Ed.2d 407 (2003). Hence, courts are heavily involved in ensuring that all federal, state, and local districts satisfy the one-person, one-vote criteria.

■ When a court is forced to draw congressional districts because the legislature has failed to do so, the court carries out the same duty the legislature would have. Redistricting involves prospective rules for elections, rather than a retrospective decision based on past events. Thus, when redistricting, the court's task closely resembles legislation. *See* Saul Zipkin, *Judicial Redistricting and the Article I State Legislature,* 103 Colum. L.Rev. 350, 379–80 (2003). In so doing, the court gathers information regarding alternative plans, hears expert advice, weighs alternatives, and ultimately adopts the plan it deems the best for the state. *See generally, e.g., Beauprez v. Avalos,* 42 P.3d 642 (Colo.2002). In the end, the court's plan is just as effective as a law passed by the legislature: it supercedes the prior districts, and remains in effect until legally replaced at a later date.

■ In sum, the term "General Assembly" in the first sentence of Article V, Section 44, broadly encompasses the legislative process, the voter initiative, and judicial redistricting. Regardless of which body creates the congressional districts, these districts are equally valid. Hence, judicially created districts are no less effective than those created by the General Assembly.

### 2. When Colorado May Redistrict

■ The second sentence of Article V, Section 44, says *when* redistricting may take place: "[w]hen a new apportionment shall be made by congress." [10] a Colorado statute, enacted in 1999, defines "new apportionment." § 2–2–901(1)(a), 1 C.R.S. (2002). It says that "a new apportionment occurs after each federal decennial census." *Id.* Moreover, the one-person, one-vote doctrine firmly requires redistricting after each national census. *Georgia v. Ashcroft,* —— U.S. ——, —— n. 2, 123 S.Ct. 2498, 2516 n. 2, 156 L.Ed.2d 428 (2003). Thus, the second sentence requires that redistricting must take place "when" there is a census: *at least* once per decade.

The crucial question for us, however, is whether redistricting may occur *more often* per decade.

---

**10.** We neither examine nor decide whether federal law prohibits redistricting more than once

than once per decade. The Secretary of State and General Assembly argue that the General Assembly may redistrict at any time, even more than once per decade. They do not interpret the second sentence to constrain the General Assembly in any way. We reject this construction.

Our decision turns upon the interpretation of the second sentence in Article V, Section 44. In construing our constitution, our primary task is to give effect to the framers' intent. *Grant v. People*, 48 P.3d 543, 546–47 (Colo.2002). To ascertain this intent, we begin with the plain meaning of Section 44. *Id.* at 546. Then, by way of confirmation, we proceed to examine Section 44 in light of its context within the state constitution. Next, we review similar cases from other states, and find that they comport with our holding. Finally, we demonstrate that custom, history, and policy support our holding as well.

The second sentence of Section 44 places a temporal restriction on redistricting. In the sentence "[w]hen a new apportionment shall be made by Congress, the general assembly shall divide the state into congressional districts accordingly," the word "when" is used as a subordinating conjunction. It indicates the relationship of redistricting and apportionment—redistricting "shall" take place "when" apportionment occurs. "When," in this context, means "just after the moment that," "at any and every time that," or "on condition that." *Webster's Third New World International Dictionary of the English Language* 2602 (Philip Babcock Gove ed., 1993) [hereinafter *Webster's Dictionary*]. All of these definitions indicate that in Section 44, the word "when" means that redistricting may only occur after a new apportionment. Applying this language in the instant case: a new apportionment is a "condition" for redistricting; redistricting must take place "any and every time" a new apportionment occurs; and, redistricting must take place "just after" a new apportionment. Conversely, redistricting may not happen spontaneously or at the inducement of some other unspecified event; it must happen after and only after a new apportionment. Because section 2–2–901(1)(a) defines "new apportionment" to be

synonymous with a federal census, redistricting must take place after and only after a census.

Furthermore, as other states have found, when the constitution specifies a timeframe for redistricting, then, by implication, it forbids performing that task at other times. *People ex rel. Mooney v. Hutchinson*, 172 Ill. 486, 50 N.E. 599, 601 (1898) ("Where there are provisions inserted by the people as to the time when a power shall be exercised, there is at least a strong presumption that it should be exercised at that time, and in the designated mode only; and such provisions must be regarded as limitations upon the power"); *Denney v. State ex rel. Basler*, 144 Ind. 503, 42 N.E. 929, 931–32 (1896) ("The fixing, too, by the constitution, of a time or a mode for the doing of an act, is, by necessary implication, a forbidding of any other time or mode for the doing of such act."). Here, Section 44 specifies the time for redistricting—just after a new apportionment—and the logical conclusion is that redistricting is forbidden at other times.

We also look to the text of Section 44 as it was originally written to confirm our interpretation of the current language. When ratified in 1876, Section 44 said that although there was then only one United States Representative from Colorado, the General Assembly should create more districts "when" the state received more seats. This clear mandate did not give the General Assembly unfettered authority to create new districts. It is absurd to imagine the General Assembly drawing districts *before* Congress gave a second seat in the House of Representatives. Instead, the second sentence requires that congressional apportionment be a necessary and logical trigger for the General Assembly to perform its task. Unfettered authority is especially unlikely in light of the limited authority the Colorado Constitution originally gave to Colorado's General Assembly.

In its brief and during oral argument, the General Assembly strongly asserted that the 1974 changes in Section 44 were technical changes intended to eliminate obsolete language. They assure us that no substantive changes were made in Section 44. Thus, the second sentence of Section 44, as it was

originally written, placed a temporal restriction on redistricting, and the temporal limitation remains in the most recent version of Section 44.

To read the second sentence to mean otherwise would render it superfluous. The first sentence of Section 44 says: "The General Assembly shall divide the state into as many congressional districts as there are representatives in congress ... for the election of one representative to congress from each district." The second sentence says: "When a new apportionment shall be made by congress, the general assembly shall divide the state into congressional districts accordingly." If the second sentence did not place a time constraint upon redistricting, then all that would remain of this sentence would be a directive for the General Assembly to divide the state into single-member districts—exactly what the first sentence in Section 44 already requires.

We will not assume that the 1974 technical changes to Section 44 rendered the second sentence superfluous. *See, e.g., Welby Gardens v. Adams County Bd. of Equalization,* 71 P.3d 992, 995 (Colo.2003) (saying that "[i]n construing a statute, interpretations that render statutory provisions superfluous should be avoided"); *Grant v. People,* 48 P.3d 543, 547 (Colo.2002). Instead, we interpret Section 44 to mean that the General Assembly (or voters by initiative, or the courts) must create as many congressional districts as there are congressional representatives, and it must do so at a specific time—after a census.

The framers' intent to limit the frequency of congressional redistricting is evident when the congressional redistricting language in the original 1876 Constitution is compared with the legislative redistricting language from 1876. Section 44 originally limited the timeframe for congressional redistricting, as it still does, to "when a new apportionment shall be made by Congress." Section 47, however, originally said that "[s]enatorial and representative districts may be altered *from time to time, as public convenience may require.*" Colo. Const. art. V., § 47 (amended 1974) (emphasis added). "From time to time" means "occasionally" or "once in a while." *Webster's Dictionary* at 2395. In *Armstrong v. Mitten,* this court assumed without deciding that this language allowed *legislative* redistricting more than once per census period. 95 Colo. 425, 428, 37 P.2d 757, 758 (1934). The contrast between these two sections clearly demonstrates that the framers intended to restrict the frequency of *congressional* redistricting to once per census. If the framers had intended to allow the General Assembly to draw the congressional districts at will, without temporal limitation, they would have used the "from time to time" language that they used in Section 47.

Our interpretation is supported by history and custom. We have never been called upon to interpret Section 44 in the past because the General Assembly has never before drawn congressional districts more than once per decade. Just the opposite is true. As we discussed earlier in this opinion, the legislature has only redistricted six times when it should have done so thirteen times.[11] The legislature has been so reluctant to draw new districts that it allowed at-large elections for newly created seats in 1902–1912.[12] And it did not act at all during the four decades between 1921 and 1964.

This reluctance to redistrict is even more significant in light of the fact that state political control has changed hands many times over the years. Since 1915, when the Colorado session laws began listing the party affiliation for the state legislators,[13] political control of the General Assembly and governorship has been in the hands of a single political party quite often. The state was entirely in Republican hands in 1915–16,

---

**11.** Until SB 03–352, the General Assembly had redrawn congressional districts only in 1891, 1913, 1921, 1964, 1971, and 1992.

**12.** In 1900, Congress allocated a third seat to Colorado, and in 1910 a fourth. The legislature did not redistrict, however, between 1891 and 1913. Kenneth C. Martis, *The Historical Atlas of*

*United States Congressional Districts: 1789–1983* (1982).

**13.** The statistics cited above were compiled from the front of the Colorado Session Law books, which have listed party affiliations since 1915.

1921–22, 1925–26, 1943–46, 1951–54, 1963–64, 1967–74, 1999–2000, and 2003. And Colorado was controlled by Democrats in 1917–18, 1933–38, and 1957–62. Yet since 1915, the General Assembly only redistricted four times: 1921, 1964, 1971, and 1992. If the General Assembly has always understood the state constitution to allow redistricting more than once per decade, there should be some evidence that it exercised that power. Yet there is none. Even when the party in control changed, there was no new redistricting of congressional seats.

This is the tradition in many other states as well. As one author put it, politicians understand that a census is a necessary prerequisite for redistricting:

> [T]here is no denying that when a new party gains a legislative majority in mid-decade it does not redistrict the state's congressional delegation right away but waits until the next Census. This is another of the "rules of the game" in legislative life, for everyone wants to avoid violent seesaws in policy.

Hacker, *Congressional Districting* at 66.

The 1999 General Assembly also interpreted the state constitution to limit congressional redistricting to once per decade when it enacted section 2–2–901. *See* Ch. 170, sec. 1, § 2–2–901, 1999 Colo. Sess. Laws 559, 559–60. Subsection 2–2–901(1)(a) says that congressional redistricting "occurs after each federal decennial census." Subsection 2–2–901(1)(b), regarding legislative redistricting, similarly states that legislative redistricting occurs "after each federal census." It is undisputed that the state constitution now limits legislative redistricting to once every ten years, so we find it significant that the Colorado General Assembly used the same language to describe the timeframe for both legislative and congressional redistricting.[14] This statute is yet another indication that the Colorado Constitution requires congressional redistricting once and only once per decade.

In sum, the plain language of Section 44, the General Assembly's past redistricting customs, and the General Assembly's own interpretation of Section 44 all demonstrate that the framers of the Colorado Constitution intended that congressional districts must only be drawn once per decade.

### E. Other Jurisdictions

Although certainly not binding authority, we have looked to other states for guidance. The constitutions of our sister states vary. Some set forth detailed schedules for redistricting immediately following each decennial census. *See, e.g.,* Ariz. Const. art. IV, part 2, § 1. Other states simply require redistricting in the legislative session immediately following a decennial census. *See, e.g.,* Utah Const. art. IX, § 1. Still others allow congressional redistricting "at any time" or "from time to time." *See, e.g.,* S.C. Const. art. VII, § 13; Wyo. Const. art. III, § 49. Finally, some state constitutions do not address congressional redistricting at all. *See generally, e.g.,* Tex. Const. Despite the differences in state approaches to congressional redistricting, we have found no decision by any state's highest court that has interpreted its constitution to allow redistricting more than once per decade. To the contrary, many have concluded that congressional redistricting may only occur once per census period.

For example, in 1983, California emphatically reinforced its prior holdings that the state constitution prohibits redistricting more than once per decade. *Legislature v. Deukmejian*, 34 Cal.3d 658, 194 Cal.Rptr. 781, 669 P.2d 17 (1983). Article 21, Section 1, of the California Constitution provided: "In the year following the year in which the national census is taken ... the Legislature shall adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts...." In *Deukmejian*, the California Supreme Court recounted over seventy-five years of cases consistently up-

---

**14.** *See* Colo. Const. art. V, § 48 (as amended by voter initiative in 1974) (requiring that a bipartisan reapportionment commission draw state legislative districts, and specifying in detail that the redistricting take place after the federal census results and before the precinct caucuses of the following election year); Legislative Council of the Colo. Gen. Assembly, *An Analysis of 1974 Ballot Proposals* 29 (Research Publication No. 206, 1974) ("Adoption of the proposal would mean that reapportionment of legislative districts would occur only once every 10 years....").

holding the "once-a-decade rule." *Id.* at 22–24. The first California case so holding was *Wheeler v. Herbert,* 152 Cal. 224, 92 P. 353 (1907). *Wheeler* also cited and discussed similar holdings from several other states, including New York, Massachusetts, Michigan, Ohio, Wisconsin, Virginia, and North Carolina. *Deukmejian,* 194 Cal.Rptr. 781, 669 P.2d at 23. Since *Wheeler,* California courts have been consistently emphatic in holding that congressional redistricting can only occur once per decade.

There are only two authorities to the contrary that we have found or that were noted in the numerous briefs filed in this redistricting case. The first case was from South Carolina, which has a constitutional provision very different from Colorado's. In 2002, the South Carolina General Assembly was unable to pass a congressional redistricting bill. *Colleton County Council v. McConnell,* 201 F.Supp.2d 618 (D.S.C.2002). Because the redistricting plan in effect in 2002 had been enacted prior to the 2000 census, the Federal District Court for South Carolina declared the existing plan unconstitutional and drew its own districts. *Id.* The federal court, however, was careful to say that its plan was only effective until and unless the state General Assembly enacted a plan. *Id.* at 670–71. This reasoning was in light of the specific language in the South Carolina Constitution saying that the "General Assembly may at any time arrange the various Counties ... into Congressional Districts...." S.C. Const. art. VII, § 13. This "at any time" language allows the South Carolina General Assembly much greater freedom to draw congressional districts than the Colorado Constitution allows the Colorado General Assembly. The Colorado Constitution only allows redistricting "when" there is a census.

The second authority was from a federal district court in Florida. *Johnson v. Mortham,* 915 F.Supp. 1529 (N.D.Fla.1995). Prior to *Johnson,* the Florida legislature had failed to pass a congressional redistricting plan for the 1992 election, so a federal three-judge panel created a plan instead. *Id.* at 1533; *DeGrandy v. Wetherell,* 794 F.Supp.

1076 (N.D.Fla.1992). Subsequently, the *Johnson* court held that the three-judge panel had no authority to· create a permanent redistricting plan,[15] and that the state legislature had authority to replace the judicial plan with its own plan at any time.· 915 F.Supp. at 1544.

Before reaching its conclusion, the court acknowledged three federal cases that have adopted "permanent" redistricting plans. *Id.* In the first, *Connor v. Coleman,* the United States Supreme Court ordered a district court to adopt a permanent reapportionment plan for the Mississippi Legislature. 425 U.S. 675, 96 S.Ct. 1814, 48 L.Ed.2d 295 (1976). Then, in *Garza v. County of Los Angeles,* the Ninth Circuit upheld a lower court's adoption of a permanent plan for county supervisor districts. 918 F.2d 763 (9th Cir.1990). Finally, in *Kimble v. County of Niagara,* a federal court in New York adopted a permanent plan for elections to the county legislature. 826 F.Supp. 664 (W.D.N.Y.1993).

Notwithstanding these cases, the *Johnson* court held that, two opposing cases constituted the "clear weight of authority" that courts cannot create permanent districts. Neither of these two cases is relevant to the case at hand, however. Neither involved the question of whether a legislature·could redistrict in the same census period after a prior court-imposed plan; neither is factually similar to the instant case; neither examined a state constitution; and certainly neither interpreted constitutional provisions similar to Colorado's.

Instead, both cases ·involved legislatively adopted plans. In *Burns v. Richardson,* the Hawaii senate redistricting plan was expressly adopted to bridge the time gap until a constitutional convention could be convened to amend state constitutional provisions regarding redistricting. 384 U.S. 73, 80, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). We have no similar issue here. In the other case, *Wise v.· Lipscomb,* there is no majority opinion. 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978). The plurality opinion states that a federal court may "devise and

---

**15.** The *Johnson* court clarifies: "It is clear that 'permanent,' in the context of reapportionment and redistricting, means until the next decennial census." *Johnson,* 915 F.Supp. at 1544.

impose a reapportionment plan pending later legislative action." *Id.* at 540, 98 S.Ct. 2493 (opinion of White, J., with Stewart, J., concurring). However, the statement is dicta because the plan involved in that case was found to be a legislative plan, not a court-imposed plan.

Our decision today is based upon Article V, Section 44, of the Colorado Constitution. Because *Wise* and *Burns* do not interpret any state constitution or statute involving redistricting, we do not find these cases persuasive or even relevant to our analysis. Even if we assume without deciding that the federal Constitution does not prohibit mid-decade congressional redistricting, our state constitution does not allow it and this is a question of state law.

### F. Public Policy Considerations

Our holding today not only is consistent with custom, precedent, and other states' laws, but also rests upon solid policy foundations. The framers of the United States Constitution intended the House of Representatives to "have an immediate dependence upon, and sympathy with the people." Joseph Story, *Story's Commentaries on the Constitution* § 291 (1833) [hereinafter *Story's Commentaries*]. Unlike the Senate, the House should "emanate directly from" the American people and "guard their interests, support their rights, express their opinions, make known their wants, redress their grievances, and introduce a pervading popular influence throughout all the operations of the government." *Id.* For this to be true, according to Justice Story, the representatives' power, influence, and responsibility must be directly tied to the constituents. *Id.* at § 292. A "fundamental axiom of republican governments," he said, is that there must be "a dependence on, and a responsibility to, the people, on the part of the representative, which shall constantly exert an influence upon his acts and opinions, and produce a sympathy between him and his constituents." *Id.* at § 300.

The framers knew that to achieve accountability, there must be stability in representation. During the debates over the frequency of congressional elections, James Madison said: "Instability is one of the great vices of our republics, to be remedied." I *1787: Drafting the U.S. Constitution* 212 (Wilbourn E. Benton ed., 1986) (notes of Mr. Madison). At the same time, the framers recognized that as the new union evolved, the population of the states would shift and grow and require changes in the distribution of congressional seats. *Id.* at 376. This fundamental tension between stability and equal representation led the framers to require ten years between apportionments. *Armstrong v. Mitten*, 95 Colo. 425, 433–34, 37 P.2d 757, 761 (1934) (citing with approval *People ex rel. Snowball v. Pendegast*, 96 Cal. 289, 31 P. 103, 105 (1892), which says the framers of the state constitution must have consciously balanced the upheaval associated with redistricting with the need for equal representation). This ten-year interval was short enough to achieve fair representation yet long enough to provide some stability.

Our interpretation of Article V, Section 44, of the Colorado Constitution supports these notions of accountability and fairness. Limiting redistricting to once every ten years maximizes stability. In its brief, the General Assembly, however, argues that it should be allowed to redistrict two, or even ten times in a single decade. If the districts were to change at the whim of the state legislature, members of Congress could frequently find their current constituents voting in a different district in subsequent elections. In that situation, a congressperson would be torn between effectively representing the current constituents and currying the favor of future constituents.

Moreover, the time and effort that the constituents and the representative expend getting to know one another would be wasted if the districts continually change. *See* James A. Gardner, *One Person, One Vote and the Possibility of Political Community*, 80 N.C. L.Rev. 1237, 1242 (saying that "[a] boundary that is continually moving is one that is unlikely to serve as any kind of imaginative focal point for communal identity . . ." and "[r]edistricting thus flattens identity within a jurisdiction by preventing subcommunities from enjoying the kind of stability and sense of permanence that are necessary

ingredients for communal self-identification and, ultimately, differentiation"). Instead, we find that the framers of the Colorado Constitution intended to balance stability and fairness by both requiring and limiting redistricting to once per decade.[16] Had they wished to have more frequent redistricting, the framers would have said so. They did not.

## VI. The Holding in This Redistricting Case

■ Having held that the Colorado Constitution limits redistricting to once per decade, we now turn to the facts of the redistricting case at hand. Here, the Colorado General Assembly failed to create new congressional districts before the 2002 general elections, despite one regular session and two special sessions. In lieu of a legislative plan, the state district court was obligated to set forth its own carefully considered plan. This court upheld the district court's plan in *Beauprez v. Avalos.* 42 P.3d 642 (2002). Then, in 2002, seven U.S. Representatives were elected under this new plan. In May of 2003, however, the General Assembly passed a new congressional redistricting plan of its own.

Under our holding today, the General Assembly may only create a redistricting plan after the federal census (and the resulting congressional apportionment to the states) and before the ensuing general election. In this case, that would have been between April 1, 2001, when the U.S. Congress notified Colorado that it would gain an additional representative, and March 11, 2002, when the election process began. As we know, the General Assembly failed to act within this time frame. The fact that the courts were forced to create the 2002 redistricting plan in the absence of a valid legislative plan makes no difference. Congressional districts created by a court are equally effective as those created by the General Assembly and disruption of those districts triggers the

same policy concerns. Consequently, the General Assembly's 2003 redistricting plan is not permitted by Article V, Section 44, of the Colorado Constitution because it is the second redistricting plan after the 2000 census. Hence, Senate Bill 03–352 is unconstitutional and void.

## VII. Conclusion

We make our rule to show cause absolute in case number 03SA133, and discharge our rule to show cause in case number 03SA147. Until Congress apportions seats to Colorado after the next federal census, the Secretary of State is ordered to conduct congressional elections according to the plan approved in *Beauprez v. Avalos.*

Justice KOURLIS and Justice COATS join as to Part IV, and dissent as to the remainder of the Opinion.

Justice KOURLIS dissenting:

Although I join in part IV of the majority opinion in its conclusion that the Attorney General may initiate an original proceeding to contest the constitutionality of legislative action, I respectfully dissent from all other portions of the opinion.

The majority concludes that the delegation of redistricting power in Article V, Section 44, of the Colorado Constitution to the "General Assembly" includes the courts and specifically imbues the courts with independent authority to undertake such redistricting. Further, the majority reads the word "when" in Article V, Section 44, of the Colorado Constitution to limit the exercise of all redistricting authority, by the General Assembly or the courts, to a window of time between a new apportionment by Congress and the next general election.

I fundamentally disagree. Courts cannot be lawmakers under Article V of the Colorado Constitution. Courts do not enact[1] or create laws; courts declare what the law is

---

**16.** Of course, additional redistricting may become necessary if existing districts are declared unconstitutional on grounds such as racial discrimination. In that case, the legislature or ultimately the courts must create constitutional districts no matter when it occurs.

**1.** *See Branch v. Smith,* 538 U.S. 254, 123 S.Ct. 1429, 1437, 155 L.Ed.2d 407 (2003).

and what it requires. To hold otherwise violates the clear language of Article V and also the mandates of Article III of the Colorado Constitution, which delineates the separation of powers among the three coordinate branches of Colorado government.

The only authority that courts have to intervene in this purely political, legislative process is to review the constitutionality of existing districts, as we would review the constitutionality of any law, in order to protect the voting rights of aggrieved claimants. Within that limited framework, courts may enter emergency or remedial orders for the purpose of allowing elections to go forward. Such court orders are interstitial, and cannot then serve to preempt the legislature from reclaiming its authority to redistrict.

The majority also determines that redistricting must occur within the narrow window of time between Congressional approval of a reapportionment and preparation of precinct information for the next general election. According to the majority, if the General Assembly fails to act within that time, it abdicates the responsibility to the courts for a decade. I find nothing in our Constitution that so provides. To the contrary, I would read the Colorado Constitution, as a whole, as abhorring such a transfer of legislative power to the judicial branch.

Therefore, since, in my view, the authority remains vested in the Colorado General Assembly, to be exercised after a reapportionment by Congress, but within no specific time limits, I would discharge the Rule to Show Cause issued in this case. In that regard, I also note that I do not believe that this court should ever have chosen to accept original jurisdiction in this case. At the time this court did so, there was a case pending in the Denver District Court that raised all of the issues before us now, plus a variety of other legal and factual issues. If that case had been allowed to proceed, the trial court would not only have addressed all disputed issues of fact but would also have ruled on all legal theories presented by the plaintiffs. In that situation, we would be in a position to resolve the issues with a full factual record. By taking this case when we did, we unnecessarily circumvented the normal process of case resolution, and limited ourselves to addressing the constitutional issues first rather than as a last resort.

## I. Article V Does Not Grant the Courts Authority to Redistrict the State

Article I, Section 4, of the United States Constitution provides that "[t]he times, places and manner of holding elections for senators and representatives shall be prescribed in each state, *by the legislature thereof*, but the congress may at any time, by law, make or alter such regulations, except as to the places of choosing senators". (emphasis added).

Article V, Section 44, of the Colorado Constitution implements that responsibility as follows:

> The *general assembly* shall divide the state into as many congressional districts as there are representatives in congress apportioned to this state by the congress of the United States for the election of one representative to congress from each district. When a new apportionment shall be made by congress, the *general assembly* shall divide the state into congressional districts accordingly.

(emphasis added).

The majority determines that the reference to "General Assembly" in Article V includes the courts. For that unusual proposition, the majority argues that the United States Supreme Court has assigned to the states the right to define "legislature" under Article I, Section 4, of the U.S. Constitution by operation of state law, citing *Smiley v. Holm*, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932), and that Colorado law supports such an inclusion.

In *Smiley*, the U.S. Supreme Court did hold that the term legislature in the U.S. Constitution refers to a state's lawmaking process, which is then defined by state law. *Id.* at 372, 52 S.Ct. 397 (discussing *Davis v. Hildebrant*, 241 U.S. 565, 36 S.Ct. 708, 60 L.Ed. 1172 (1916)). In *Smiley*, the Minnesota legislature attempted to implement a redistricting bill without gubernatorial approval or overturn of gubernatorial veto. The Supreme Court of Minnesota interpreted Arti-

cle 1, Section 4, as vesting the power to redistrict solely in the legislative body of Minnesota, without the need for gubernatorial approval. *See State ex rel. Smiley v. Holm*, 184 Minn. 228, 238 N.W. 494, 497–98 (1931). The United States Supreme Court disagreed, concluding instead that the term referred to the lawmaking process applicable in Minnesota.

The Supreme Court stated:

As the authority is conferred for the purpose of making laws for the state, it follows, in the absence of an indication of a contrary intent, that the *exercise of the authority must be in accordance with the method which the state has prescribed for legislative enactments.* We find no suggestion in the federal constitutional provision of an attempt to endow the Legislature of the state with power to enact laws in any manner *other than that in which the Constitution of the state has provided that laws shall be enacted.* Whether the Governor of the state, through the veto power, shall have a part in the making of state laws, is a matter of state polity. Article 1, s 4, of the Federal Constitution, neither requires nor excludes such participation.

*Smiley*, 285 U.S. at 367–68, 52 S.Ct. 397 (emphasis added). The Supreme Court then analyzed Minnesota's Constitution and concluded that the lawmaking process, as defined by that state, included the participation of the governor. *Id.* at 372–73, 52 S.Ct. 397.

Thus, *Smiley* does stand for the proposition that the term "legislature" in the U.S. Constitution encompasses more than just the General Assembly acting alone, and refers instead to the general process of lawmaking in a given state. Furthermore, *Smiley* clarifies that it is a matter of Colorado law to determine what constitutes that process of lawmaking.[2]

That circuitous process avails the majority little. Colorado law could not be clearer with respect to the meaning of the term "General Assembly." Article V itself defines the General Assembly as "the senate and house of representatives, both to be elected by the people." The term neither needs nor permits any further semantic gymnastics.

Under the mandate of *Smiley*, however, "General Assembly" cannot just mean that the two houses may independently exercise the redistricting authority. In Colorado, we reached that same conclusion shortly after the *Smiley* decision was announced. *See Armstrong v. Mitten*, 95 Colo. 425, 37 P.2d 757, 758 (1934) (a case in which this court approved redistricting by initiative). Together, then, *Armstrong* and *Smiley* dictate that the narrow reference in Article V, Section 44, to the "General Assembly" must be read more broadly to include the process of initiative on the one hand, and gubernatorial approval on the other.

Article V embodies just such breadth. Section 1 of Article V reserves to the people the power of initiative and referendum. Section 39 sets out the condition that before a law may take effect, it shall be approved by the Governor, or re-passed by two-thirds of both houses. Article V is, therefore, a self-contained and complete description of the lawmaking processes and legislative powers in Colorado.

Redistricting is a lawmaking function, and is to be, in my view, accomplished within the rubric of Article V—which, of course, contains no reference to the courts.[3] Similarly, Article VI, which describes judicial powers in Colorado, makes no reference either to lawmaking in general or to redistricting in particular.

---

**2.** Although the majority indicates that it relies only upon state law to define the power to redistrict, it nonetheless acknowledges the importance of federal law in shaping the court's role in that process. Maj. op. at 1226, 1231, 1232, and 1235. That acknowledgement, from my perspective, is a telltale indication of the premise that court authority does truly stem from federal law and is not here independently created by operation of the state constitution.

**3.** We have held that the constitutional assignment in Article V, Section 48, to the Chief Justice of the Colorado Supreme Court of the duty of appointing four members to the state legislative reapportionment commission is not a violation of separation of powers because it is specifically required by the constitution. *In re Interrogatories Propounded by the Senate Concerning House Bill 1078*, 189 Colo. 1, 536 P.2d 308, 315 (1975).

Not only, then, does Colorado law not support an independent assignment of the right to redistrict to the courts, but rather, it precludes it. Article III of the Colorado Constitution, which spells out separation of powers among and between the three branches of government, prohibits the judiciary from undertaking a function assigned by the constitution to another branch of government. *People v. Zapotocky*, 869 P.2d 1234, 1243–44 (Colo.1994). Article III directs that "no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted." This precept imposes on the judiciary both a proscription against interfering with the executive or legislative branches, and a duty to perform its constitutional and statutory obligations with complete independence. *Zapotocky*, 869 P.2d at 1243–44; *see also People v. Herrera*, 183 Colo. 155, 516 P.2d 626, 627 (1973) (The statute that gave courts the power of sentence commutation was an unconstitutional violation of separation of powers because such power rests with the executive.).

The separation of powers concept is fundamental to our free system of government, and accordingly, this court is "unalterably opposed to any attempt by one branch of the government to assume the power of another." *In re Interrogatories*, 536 P.2d at 318.

Because the constitution assigns redistricting to the legislative branch of government under Article V, Section 44, Article III mandates that the judiciary may only exercise that power if expressly so directed or permitted by the constitution. Implied exceptions are not sanctioned; this is the plain meaning of Article III. *Denver Bar Ass'n v. Public Util. Comm'n*, 154 Colo. 273, 391 P.2d 467, 470 (1964). Simply stated, under Colorado law, courts may not usurp the legislative function of redistricting.

## II. The Limited Role of the Courts in Redistricting

The courts do have the ultimate responsibility of reviewing redistricting plans, just as we may review all other laws, to determine whether they comport with the constitution. *In re Interrogatories*, 536 P.2d at 316 (citing to *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)).

Prior to 1964, courts played only an anecdotal role in the process, in part because redistricting was perceived to be a non-justiciable, political issue,[4] and in part because constitutional issues seldom arose.[5] Further, many legislatures, like our own, chose not to redistrict for long periods of time.

In 1962, the U.S. Supreme Court issued *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In that case, the Court confirmed that voters in Tennessee, who claimed that the congressional districts in effect in that state deprived them of equal protection of law under the Fourteenth Amendment to the U.S. Constitution by debasing their vote in comparison to other voters, had presented a justiciable claim over which the court had jurisdiction. *Id.* at 209, 82 S.Ct. 691.

The following year, the U.S. Supreme Court announced a decision in *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). There, the Court held that the mandate of Article I, Section 2, of the U.S. Constitution, which said that Representatives to Congress be chosen by the people, meant that "one man's vote in a congressional election is to be worth as much as another's." *Id.* at 7–8, 84 S.Ct. 526. Stated differently, for the first time, the Court declared that congressional districts were to be divided as nearly equally as possible by population.

The third case in this trilogy was announced in 1964. In *Reynolds v. Sims*, 377 U.S. 533, 568–69, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court held an Alabama legislative redistricting plan unconstitutional under the Equal Protection Clause because the apportionment was not made on

---

4. *See Colegrove v. Green*, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946).

5. *See Armstrong*, 95 Colo. 425, 37 P.2d 757 (example of one of the early cases raising constitutional issues in redistricting).

population and lacked a rational basis. *Reynolds* emphasized that "legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Id.* at 586, 84 S.Ct. 1362.

Lastly, in 1965, Congress passed the Voting Rights Act, 42 U.S.C. § 1973 (2003), which recognized the need in redistricting to protect minority voters. Under that Act, courts have been called upon to undertake additional supervisory authority. Hence, since the mid–1960's, there have been numerous cases around the nation where courts have become involved in redistricting issues.

Most recently, in *Branch*, 538 U.S. 254, 123 S.Ct. 1429, 155 L.Ed.2d 407, the U.S. Supreme Court dealt with the interrelationship between federal and state courts, specifically in connection with a redistricting plan covered by the Voting Rights Act of 1965. The Court held that the Federal District Court in that case properly enjoined enforcement of the state court plan because the state court plan had not been pre-cleared under the Voting Rights Act. *Id.* at 1437. The Court further held that the Federal District Court plan was required to comply with the statutory requirement to draw single-member districts whenever possible. *Id.* at 1441. By so holding, the Court determined that the reference in 2 U.S.C. § 2c of the Apportionment Act to districts "established by law" affirmatively applied to judicial redistricting as well as to legislative redistricting. *Id.* The Court did not address the question before us today of whether such court order would preempt the state legislature from reclaiming the right to redistrict.

Indeed, the Supreme Court has previously stated that courts should make every effort to avoid preempting the exercise of legislative authority. And, in *Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978), it specifically held that even when a federal district court had declared an existing redistricting scheme unconstitutional, the court must then give the legislative body a reasonable opportunity to adopt a substitute plan rather than for the court to devise its own plan. The Supreme Court stated:

> The new legislative plan, if forthcoming, will then be the governing law unless it, too, is challenged and found to violate the Constitution. '[A] state's freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands of the Equal Protection Clause.'

*Id.* (quoting *Burns v. Richardson*, 384 U.S. 73, 85, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966)); *see also Connor v. Coleman*, 440 U.S. 612, 613, 99 S.Ct. 1523, 59 L.Ed.2d 619 (1979) (ordering a federal district court in Mississippi to file a court-ordered redistricting plan, but expressing the clear expectation that if the legislature acted in time, the legislative plan would supercede the court plan).

In *Growe v. Emison*, 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993), the Supreme Court reviewed a congressional redistricting debacle in Minnesota. Ultimately, the Supreme Court concluded that the "[Federal] District Court erred in not deferring to the state court's timely consideration of congressional reapportionment." *Id.* at 37, 113 S.Ct. 1075. Justice Scalia, writing for the majority, called the state court's intervention "precisely the sort of state judicial *supervision* of redistricting we have encouraged." *Id.* at 34, 113 S.Ct. 1075 (emphasis added). Again, the Court did not imply that either the federal or state court could preempt the legislative prerogative.

Other courts around the nation have similarly recognized the supervisory, temporary and interstitial character of court-ordered redistricting plans. In *Johnson v. Mortham*, 915 F.Supp. 1529 (N.D.Fla.1995), the Federal District Court for the Northern District of Florida faced a controversy similar to the one before our court today. As a result of the 1990 census, Florida was entitled to four additional members in the House of Representatives. On the first day of the 1992 Florida legislative session, members of the State House of Representatives and other voters filed suit in federal court challenging the constitutionality of Florida's congression-

al and state legislative districts. This suit resulted in an order from a three-judge panel that adopted a plan and ordered the state of Florida to conduct the 1992 congressional elections "and congressional elections thereafter" in conformity with the plan. *Id.* at 1533–34 (quoting *DeGrandy v. Wetherell,* 794 F.Supp. 1076, 1090 (N.D.Fla.1992)).

The plaintiffs argued that the *"DeGrandy"* order was a temporary solution interposed at a time when the state legislature had insufficient time to enact a new plan before the elections, which did not deprive the legislature of the authority to act after the elections. The District Court recognized that the language "and congressional elections thereafter" had one of two results: either that the court had intended its plan to be permanent, or that the legislature had interpreted it in that fashion and had thereby been dissuaded from enacting its own plan. *Id.* at 1543–44. The District Court then held that "[t]o the extent that the first result occurred, the *DeGrandy* plan is unconstitutional. To the extent the second result occurred, the law is clear that a state legislature always has the authority to redistrict or reapportion, subject to constitutional restraints." *Id.* at 1544. While recognizing that some authority would permit federal court plans to serve as permanent redistricting plans, the court found that the "clear weight of authority" was to the contrary. *Id.* Specifically, the District Court emphasized that the U.S. Supreme Court in *Wise* went to great lengths to point out that federal courts must "devise and impose a reapportionment plan *pending later legislative action." Id.* (quoting *Wise,* 437 U.S. at 540, 98 S.Ct. 2493). The District Court also relied on *Burns,* 384 U.S. at 85, 86 S.Ct. 1286, where the Supreme Court stated: "[t]he State remains free to adopt other plans for apportionment, and the present interim plan will remain in effect no longer than is necessary to adopt a permanent plan." *Mortham,* 915 F.Supp. at 1544. The court felt constrained by the twin principles of federalism and separation of powers from usurping the state legislature's authority to adopt a constitutional redistricting plan, and concluded that it would violate both principles to enshrine the *DeGrandy* plan as permanent. *Id.* at 1545.[6]

Thus, in my view, the U.S. Supreme Court ushered in the era of court involvement in redistricting by clarifying that the Fourteenth Amendment protects voters' rights and the courts are charged with enforcing that protection. When districts are not constitutionally adequate, courts may fashion a remedy to protect aggrieved voters in an upcoming election. However, never has the U.S. Supreme Court held that a court-ordered plan preempts a legislature from attempting to correct a deficiency by passing its own redistricting plan.

Courts act in the first instance only because an existing apportionment of districts is constitutionally deficient. In order to have the capacity to remedy that deficiency, we must be able to issue remedial orders. Yet, neither the federal nor the state constitution supports a conclusion that such emergency relief can supplant the later exercise of legislative authority. Quite simply, the judiciary cannot legislate. *See Springer v. Gov't of Phil. Islands,* 277 U.S. 189, 201, 48 S.Ct. 480, 72 L.Ed. 845 (1928); *Speer v. People,* 52 Colo. 325, 122 P. 768, 771–72 (1912); Colo. Const. art. III.

In no other circumstance could it be debated that a court order should be published in the Colorado Revised Statutes as an enforceable statute. The court order is interstitial— a temporary remedy in place to satisfy the needs of the electoral system until the Gen-

---

**6.** *See also Ramos v. Koebig,* 638 F.2d 838, 843–44 (5th Cir.1981) in which the court held that it was error for the Federal District Court to pass upon the constitutionality of a proposed redistricting plan before the city council had the opportunity to enact a valid plan. The court stated that "[s]uch a court-ordered plan will be a temporary measure, however, and will not preclude the legislative body from devising a plan that reflects its legislative judgment. Once validly enacted, and approved by the district court on constitutional grounds, the legislative plan will become effective, and will supersede the temporary court-ordered plan."; and *Colleton County v. McConnell,* 201 F.Supp.2d 618, 670–71 (D.S.C. 2002) holding that a court order would govern elections "unless and until the South Carolina General Assembly, with the approval of the Governor and in accordance with § 5 of the Voting Rights Act, ends its current impasse and enacts an alternative redistricting plan for the legislative body at issue".

eral Assembly can exercise its rightful legislative function. In other situations, if a court declares a statute unconstitutional, the court would never presume to replace the statute with a constitutional version. That is not our function. In the electoral setting, we act on an emergency basis, to enable the pending election to go forward. However, the fundamental nature of what we do is not altered. We act only in the breach; once the legislature takes up its rightful mantle, our involvement is no longer necessary.

### III. Redistricting Is Not Time–Limited

The majority also concludes that Article V, Section 44's use of the term "when" is an independent basis under Colorado law upon which to delimit the authority to redistrict— whether exercised by the General Assembly or by the court. Thereby, the majority concludes that the brief window of time within which redistricting could occur came and went, with only the court-ordered plan in place, which operated to divest the General Assembly of its authority. Maj. op. at 1226.

In response to this argument, I first take issue with the majority's assignment of this issue to state law. Indeed, the U.S. Supreme Court has afforded broad discretion to the states to define the process whereby districts are created. However, in my view, the involvement of the courts—absent some express provision in a state constitution delegating a role to the courts (which Colorado does not have)—continues to be predicated, in large part, upon the duty to enforce federal constitutional rights. Hence, the duration of a court order protecting those rights, or the jurisdiction of a court to review existing districts when constitutional infirmities exist, must be governed by an intermixed application of state and federal law.

Colorado's Constitution neither assigns a specific function in redistricting to the courts, nor a specific time within which to complete that role. I find no support in Article V for the majority's definition of "when," which restricts not only legislative authority but also court supervisory authority. The Article does contain time frames for action in great detail in some sections, such as those imposed upon the Reapportionment Commis-

sion in Section 48. The absence of such time limits in Section 44 is telling. If the framers of Section 44 had intended to start the ticking of a time clock that would govern the redistricting process, they had language at their command with which to accomplish such an end.

Various other state constitutions do mandate the time within which reapportionment must occur. For example, the California Constitution provided that the reapportionment must take place at the "first session after each census," which the California Supreme Court construed to mean immediately after the new census figures are available, and not again thereafter until the next census. *See Leg. of the State of Cal. v. Deukmejian*, 34 Cal.3d 658, 194 Cal.Rptr. 781, 669 P.2d 17, 22 (1983) (interpreting Cal. Const. art. IV, § 6, and applying that interpretation to art. XXI, § 1). Similarly, the Oklahoma Constitution requires redistricting to occur within 90 days after the convening of the first regular session after the census. (Okla. Const. art. V, § 11A); *see also* Utah Const. art. IX, § 1; Va. Const. art II, § 6; Wis. Const. art. IV, § 3.

In *State v. Weatherill*, 125 Minn. 336, 147 N.W. 105 (1914), the Minnesota Supreme Court interpreted a reference to the "first session after each (census)" in the predecessor to its current constitutional provision as a duty to reapportion in the first session, but not a prohibition to reapportionment at a later time. The court noted that "[i]t seems clear that, had there been any intention to restrict or limit the time when a reapportionment might be made, those framing the Constitution had language at their command which, if employed, would not have left that intention shrouded in doubt or uncertainty." *Id.* at 106. Thus, that court held "the Constitution should be construed as imposing a duty of reapportionment, and that the duty so imposed continues until performed." *Id.* at 107.

Other courts agree that the legislature's duty to reapportion continues until performed. *See Harris v. Shanahan*, 192 Kan. 183, 387 P.2d 771, 795 (1963) (holding that "the duty to properly apportion legislative districts is a continuing one"); *see also Selzer*

*v. Synhorst,* 253 Iowa 936, 113 N.W.2d 724, 733 (Iowa 1962) (same); *Lamson v. Sec'y of the Commonwealth,* 341 Mass. 264, 168 N.E.2d 480, 483 (1960) (same).

This court has a duty to interpret constitutional and statutory provisions as written. Constitutional provisions should be given their plain and ordinary meaning. *Bolt v. Arapahoe County Sch. Dist.,* 898 P.2d 525, 532 (Colo.1995). The plain and ordinary meaning of "when" is that it must follow the condition precedent, which in this instance is the new apportionment by Congress. Although "when" might well be read as imposing a duty upon the legislature to act as soon as possible after the predicate event, it does not in any way imply the imposition of a back-end limitation upon that duty. In my view, burdening the word "when" in the Colorado Constitution with the implied intention that the right to redistrict is abrogated if not exercised within a narrow time frame seems heavy freight indeed.[7]

## IV. 2002 Redistricting

In *Beauprez v. Avalos,* 42 P.3d 642 (Colo. 2002), we affirmed the decision of the Denver District Court declaring the then current congressional districts as set out in section 2–1–100.5, et seq., 1 C.R.S. (2002), unconstitutional for failure to satisfy the one-person, one-vote principle. The congressional districts that appear in section 2–1–100.5 do not comport with current population realities in the state of Colorado as reflected in the 2000 census. *See also* section 2–2–901, 1 C.R.S. (2002), regarding the import of that census.

The Denver District Court acted only after the General Assembly failed to act in suffi-

cient time to allow the November, 2002 election to proceed. There is no question but that the court-ordered redistricting governed that election by virtue of the legislative abdication.

In my view, that court order was a temporary, emergency order—to be honored until such time as the legislature acted to create districts that are constitutionally sufficient.

## V. Original Jurisdiction Is Improper

Lastly, I suggest that this court should not have accepted original jurisdiction over this case, but should have allowed the Denver District Court action to proceed to completion.

On May 9, 2003, the same day on which Governor Owens signed Senate Bill 03–352 into law, two plaintiffs brought an action in Denver District Court challenging its constitutionality. *Keller v. Davidson,* No. 03 CV 3452 (Denver District Court, May 9, 2003). The plaintiffs in that case contend that the General Assembly's 2003 redistricting plan violates: Colorado's GAVEL amendment (Colo. Const. art. V, § 20); Colorado's Sunshine Law (§ 24–6–101, et seq., 7B C.R.S. (2002)); the Colorado State Senate Rules; plaintiffs' equal protection rights; and the Colorado Constitution art. V, § 22, and art. II, § 10. In short, that case includes, but is not limited to, the constitutional issues raised in this case.

Because of the additional claims, there were numerous issues of disputed fact, and an evidentiary hearing would have been necessary to resolve those disputes. The disputed facts relate to certain claims, such as the

7. The majority goes even further in concluding that redistricting can only occur once each decade. In my view, we need not reach that question because it is not before us. From my perspective, redistricting by the General Assembly has only taken place once—in Senate Bill 03–352—and I would not opine further. To the extent, however, that the majority relies upon federal law for the conclusion that redistricting is limited to once per decade, I read the cases differently. *Georgia v. Ashcroft,* —— U.S. ——, —— n. 2, 123 S.Ct. 2498, 2516 n. 2, 156 L.Ed.2d 428 (2003), holds merely that districts must meet federal constitutional mandates and "if [a] State has not redistricted in response to the new census figures, a federal court will ensure that the districts comply with the one-person, one-vote mandate before the next election." *See also Reynolds,* 377 U.S. at 583–84, 84 S.Ct. 1362 ("While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation. *And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practically desirable.*") (emphasis added). In fact, in *Armstrong,* 37 P.2d at 758, this court previously "assumed, without deciding, that under section 47, a general redistricting of the state may occur more frequently than once after each census."

claim that SB 03–352 does not comport with the GAVEL amendment, with the Sunshine Law or with the Colorado rules.

In taking this case as an original proceeding, our court has violated two bedrock rules. First, this court does not interfere in the normal process of a case when the issues can be properly resolved below and the rights of all parties preserved. Second, this court does not resolve cases on constitutional grounds when non-constitutional grounds are raised and may be dispositive.[8]

In order to satisfy the electoral time frame of this case, precincts must be established by March 15, 2004, which is 29 days prior to the precinct caucus day in 2004. (Affidavit of Secretary of State Davidson). Thus, at the time the case was filed in district court, there was ample time to conduct an evidentiary hearing, await a trial court ruling, and appeal the *Keller* case.[9] These proceedings could have been completed on an expedited basis well in advance of the March 14, 2004 deadline, and would have resulted in a full resolution of the issues.

### A. Other Relief Was Clearly Available

Under C.A.R. 21, the exercise of original jurisdiction is "extraordinary in nature and is a matter wholly within the discretion of the Supreme Court. Such relief shall be granted only when no other adequate remedy, including relief available by appeal or under C.R.C.P. 106, is available." This relief is not a substitute for appeal from a lower court proceeding and is not to be granted when it will supersede the functions of such appeal. *See Fitzgerald v. Dist. Court*, 177 Colo. 29, 493 P.2d 27, 29 (1972); *Weaver Constr. Co. v. Dist. Court*, 190 Colo. 227, 545 P.2d 1042, 1044 (1976) (There exists a general policy which disfavors the use of an original writ where an appeal would be an appropriate remedy.); *People v. Montez*, 48 Colo. 436,

110 P. 639, 640 (1910) (This court exercises original jurisdiction only in case of emergency, or where the questions involved are clearly of public interest, and then only when satisfied that the rights of the parties will not be protected and enforced in lower courts.); *Clark v. Denver & I.R. Co.*, 78 Colo. 48, 239 P. 20, 21 (1925) (This court declines original jurisdiction in cases where the issues can be fully determined and the rights of all parties preserved and enforced in the district court.).

In *People v. McClees*, 20 Colo. 403, 38 P. 468 (1894), various plaintiffs sought an injunction against the secretary of state and others preventing certain claimants from taking judicial office. The plaintiffs asked this court to assume original jurisdiction for purposes of resolving the controversy, and this court declined, stating:

> We are urged to entertain the present proceeding for the purpose of reaching an early decision of the controversy between the rival claimants to judicial positions, and thus prevent confusion in the administration of justice. This proceeding is commended as a 'short cut' to a determination of the controversy. But short cuts in legal controversies are seldom satisfactory....

*Id.* at 472. I suggest that the original proceeding here is a short cut, which reaches out to address the seminal issue without allowing the case to proceed in due course.

### B. Resolution of Cases on Non–Constitutional Grounds Preferred

Furthermore, when a constitutional question is not essential to the resolution of the issue before us, we will not address it. *Town of Orchard City v. Bd. of Delta County Commrs.*, 751 P.2d 1003, 1006 (Colo.1988); *Ricci v. Davis*, 627 P.2d 1111, 1121 (Colo. 1981) (It is well settled that a court will not rule on a constitutional question which is not essential to the resolution of the controversy

---

8. I also note that if we were addressing the appeal of the district court case, we would not need to resolve the issue concerning the Attorney General's authority, because he is not a party to the lower court case. Hence, in addition to joining issues of constitutional magnitude in the first instance, rather than only as a last resort, we are inviting still another constitutional issue which we would never have needed to reach.

9. The case was later removed to federal court, where it has been stayed awaiting this opinion. *See Keller v. Davidson*, No. 03–Z–1482 (CBS) (D.Colo. Sept. 25, 2003). It is speculation at this point to try to unravel the process and guess what might have occurred had we not taken the original proceeding.

before it.). Here, there were a number of non-constitutional issues which might have been dispositive. We will never know, because this court made a decision to accept the constitutional issue alone—uncoupled from the factual and non-constitutional underpinnings.

Our system of government relies upon courts as the final arbiters of disputes—sometimes even disputes that have a distinctly political character. I suspect that many courts charged with the duty of resolving a divisive political issue would prefer not to be in that position, but our tri-partite system of government contemplates the exercise of that duty as part of the necessary judicial power.

However, being pressed into service is quite a different matter from volunteering. In this case, I view our court as having volunteered for the task of resolving the question at issue—on the grounds that we would ultimately have to resolve it in any event and time is of the essence. The same could be true in many litigated matters, in which we decline to exercise original jurisdiction for all of the reasons appearing in the legions of cases. Furthermore, the time constraints could have been satisfied in the normal course of events, if each of the involved courts had proceeded expeditiously.

Thus, I suggest that this case is a particularly inappropriate one in which to accept jurisdiction on an original basis, and that by proceeding in this fashion, we have inserted ourselves further than necessary into the political process.

## VI. Conclusion

By exercising original jurisdiction in this case, the court has foreclosed any inquiry into the propriety of the General Assembly's redistricting process or the constitutional validity of the congressional district boundaries themselves.

Instead, the court has seized upon the underlying constitutional issue, and has reached a conclusion predicated upon two alternate, but, in my view, equally flawed, theories. First, the majority quite remarkably equates the judiciary with the legislature, thereby concluding somehow that the

General Assembly has already redistricted once since the last census and may not do so again. Second, the majority imputes to the word "when" an absolute time limitation, thereby transforming a constitutional requirement for the General Assembly to account for changes in the state's federal representation by redistricting into a prohibition against its doing so during nine out of every ten years. For both of those propositions, the majority states that it relies upon state law in an effort to insulate this case from federal review, when, in fact, the whole analysis is and must be permeated by a reliance upon federal, as well as state, law.

Whether or not the parties to this controversy were motivated in part or in whole by partisan advantage, the court's resolution of this issue has implications that transcend partisanship and are far-reaching. With its holding today, the court significantly alters our form of government. For the first time in the state's history, the court restricts the redistricting authority of the General Assembly to a narrow window, and mandates that if the General Assembly fails to act within that time frame, the court will exercise that power for it.

While eliminating political considerations from redistricting may or may not be a laudable goal, redistricting is an inherently political activity, and rests with the democratically elected branch of government for good reason. Absent express constitutional authority granting a role to the judiciary—which I suggest is wholly absent from our constitution—the courts should serve only to protect constitutional interests in redistricting: not to commandeer the process.

Accordingly, I construe the Denver District Court's and this court's prior involvement in the redistricting matter as judicial supervision, holding then-existing congressional districts illegal and imposing a temporary plan in order to allow the 2002 election to go forward. That violation has potentially been remedied by Senate Bill 03–352—assuming that no other infirmities as alleged by the *Keller* plaintiffs exist in the legislation. Thus, I would discharge the rule issued in this case and allow the *Keller* case to go

forward in order to resolve the other issues raised.

I am authorized to state that JUSTICE COATS joins in this dissent.